A06A0316. DALLAS v. FLYING J, INC.
(632 SE2d 389)

RUFFIN, Chief Judge.

Following a work-related injury, Lester Dallas was awarded temporary total disability benefits under the workers' compensation scheme. The State Board of Workers' Compensation ("the Board")

---

subsequently suspended Dallas' benefits for failure to cooperate with medical treatment. Thereafter, Dallas requested that his benefits be reinstated, his weekly payment be increased, and attorney fees be assessed against his employer, Flying J, Inc. ("Flying J"). Following a hearing, the administrative law judge ("ALJ") reinstated Dallas' benefits and increased his weekly payment.

Flying J appealed to the Board's appellate division, and Dallas cross-appealed, asserting that the ALJ erred in not deciding whether he was entitled to assessed attorney fees. The appellate division affirmed in part and vacated in part the ALJ's decision. In particular, it found that Dallas was not entitled to reinstatement of his benefits. Dallas appealed this decision to the superior court, which failed to rule within the time required by OCGA § 34-9-105 (b), resulting in an affirmance by operation of law. We granted Dallas' application for discretionary appeal, and this appeal followed. Finding no error, we affirm.

In resolving Dallas' appeal, we must keep in mind the various standards of review applicable in this case. The Board's appellate division is authorized to review the evidence adduced before the ALJ, weigh that evidence, and assess witness credibility.[1] If the appellate division determines that the preponderance of evidence supports the ALJ's decision, it will accept and affirm that award.[2] "But, if . . . the appellate division concludes that the award does not meet [the applicable] evidentiary standards, [it] may substitute its own alternative findings for those of the ALJ, and enter an award accordingly."[3] The appellate division may "substitute its findings for those of the ALJ only when its alternative findings are supported by some evidence in the record."[4]

Once the case is appealed from the appellate division, both this Court and the superior court must view the evidence in a light favorable to the party prevailing before that division.[5] If any evidence supports the appellate division's findings, those findings are binding and conclusive, and we may not "substitute [ourselves] as a fact finding body in lieu of the Board."[6]

Construed with these standards in mind, the record shows that Dallas was injured in December 2000. On August 12, 2003, the ALJ ordered Dallas to call his treating physician, Glynn Immediate Care

---

[1] See OCGA § 34-9-103 (a); *Bankhead Enterprises v. Beavers*, 267 Ga. 506, 507 (480 SE2d 840) (1997).

[2] See *Bankhead*, supra.

[3] Id.; see also OCGA § 34-9-103 (a).

[4] *Chaparral Boats, Inc. v. Heath*, 269 Ga. App. 339, 349 (2) (606 SE2d 567) (2004).

[5] See *Ga. Pacific Corp. v. Cross*, 275 Ga. App. 664, 665 (1) (621 SE2d 586) (2005).

[6] Id.

("GIC"), schedule an appointment within 15 days, attend that appointment, and cooperate with treatment. Dallas did not return to GIC, and the ALJ suspended his income benefits in December 2003 for failure to cooperate with medical treatment.

Shortly after the suspension, Dallas sought reinstatement of benefits, as well as an increase in his weekly benefit and an order assessing attorney fees against Flying J. At a hearing held on these issues, Dallas testified that he called GIC several times after receiving the August 12, 2003 order and attempted to schedule an appointment. Each time, he was told that GIC served patients on a first come, first serve, walk-in basis. Refusing to schedule an appointment, GIC instructed Dallas simply to come to the clinic.

As noted above, Dallas never returned to GIC. In his view, however, he did everything possible to comply with the ALJ's August 12, 2003 order. He thus sought reinstatement of his benefits.

With respect to his weekly wage, Dallas presented evidence that the weekly wage previously determined by the ALJ did not fully compensate him for overtime that he typically worked prior to his injury. According to Dallas, Flying J failed to pay him for this overtime, and he ultimately settled a Fair Labor Standards Act claim with the company for $35,000. Dallas testified that he should have earned "at least two or three hundred dollars more . . . [per week] for . . . overtime." Based on this testimony, he requested that the ALJ redetermine his average weekly wage to take into account overtime payments he should have received.

In his findings of fact and conclusions of law, the ALJ determined that Dallas knew GIC was a walk-in clinic that did not schedule appointments. He further found that "in any other circumstance," Dallas' failure to return to the clinic and sign in as a walk-in patient would be "deemed a failure to cooperate with medical treatment."[7] Nevertheless, because the August 12 order instructed Dallas to call GIC, schedule an appointment, and attend that appointment, which Dallas attempted but was unable to do, the ALJ concluded that Dallas "perfectly complied with the letter" of the order.[8] The ALJ thus felt constrained to lift the suspension and reinstate Dallas' income benefits back to September 1, 2003, despite the fact that Dallas had not returned to the clinic for treatment.

On the wage issue, the ALJ determined that Dallas earned $550 per week while working at Flying J, an increase from the previously determined amount of $486.65. Using this revised weekly wage, the ALJ recalculated the amount of weekly income benefits owed to

---

[7] (Emphasis omitted.)

[8] (Emphasis omitted.)

Dallas. Finally, the ALJ's order did not address Dallas' claim that Flying J should be assessed attorney fees.

Flying J appealed the ALJ's decision with respect to the reinstated benefits and the amount of those benefits. Dallas crossappealed, asserting that the ALJ erred in failing to assess attorney fees against Flying J.[9] The Board's appellate division found that the ALJ properly determined Dallas' average weekly wage to be $550. But it vacated the reinstatement of Dallas' benefits. According to the appellate division, Dallas failed to cooperate with medical treatment by not returning to GIC, and it suspended his benefits pending his return for treatment. Moreover, it found no basis for assessing attorney fees against Flying J.

1. On appeal, Dallas first argues that the appellate division erred in calculating his average weekly wage. As noted above, the ALJ determined that Dallas' average weekly wage was $550, and Dallas did not challenge this amount before the appellate division. In fact, when Flying J appealed the ALJ's finding regarding the weekly wage, Dallas argued that it should be *affirmed,* and the appellate division did so. Under these circumstances, Dallas cannot now question this finding.[10]

Based on the $550 average weekly wage, the ALJ determined that Dallas was entitled to an income benefit of $375 per week. The appellate division initially affirmed that ruling, then later amended its decision after concluding that, given the average weekly wage, the workers' compensation provisions only authorized an income benefit of $366.67. To the extent Dallas challenges this benefit calculation on appeal, we find no error.

Under OCGA § 34-9-261, "[w]hile the disability to work resulting from an injury is temporarily total, the employer shall pay or cause to be paid to the employee a weekly benefit equal to two-thirds of the employee's average weekly wage," with certain minimum and maximum limitations. Dallas' weekly wage has been found to be $550. Two-thirds of this amount is $366.67. Dallas has not shown that he is entitled to more than this sum. Accordingly, the appellate division properly determined that Dallas is entitled to compensation at the rate of $366.67 per week.

---

[9] Dallas also asserted that the ALJ erred in directing him to return to GIC and wait for treatment. That ruling, however, is not at issue in this appeal.

[10] See *Maddox v. Elbert County Chamber of Commerce,* 191 Ga. App. 478, 480 (1) (a) (382 SE2d 150) (1989) ("[N]o matter how erroneous the ruling might have been . . . , a litigant cannot submit to a ruling, acquiesce in the ruling, and still complain of same.") (punctuation omitted); *Carod Bldg. Svcs. v. Williams,* 182 Ga. App. 340, 341 (355 SE2d 723) (1987) (issue not enumerated as error in appeal to full Board of Workers' Compensation will not be considered in subsequent appeal to the Court of Appeals).

2. Dallas next argues that the appellate division improperly vacated the ALJ's reinstatement of his benefits. A claimant's responsibility for obtaining medical treatment is outlined in OCGA § 34-9-200 (c). Pursuant to this provision,

> [a]s long as an employee is receiving compensation, he or she shall submit himself or herself to examination by the authorized treating physician at reasonable times. If the employee refuses to submit himself or herself to or in any way obstructs such an examination requested by and provided for by the employer, upon order of the board his or her right to compensation shall be suspended until such refusal or objection ceases and no compensation shall at any time be payable for the period of suspension unless in the opinion of the board the circumstances justify the refusal or obstruction.[11]

The ALJ apparently concluded that since GIC is a walk-in clinic that does not take appointments, Dallas could not be penalized for failing to return to treatment, given the language in the August 12, 2003 order directing him to make an appointment. The appellate division disagreed, and we find no error.

Although the ALJ deemed Dallas' failure to return to GIC justified, the appellate division found insufficient evidence to support this conclusion. Dallas was informed by GIC on several occasions that the clinic did not take appointments, but that he could receive treatment on a first come, first serve basis. The division rejected Dallas' claim that it would be "unreasonable to expect him to sit in a room which may be cramped with twenty or more sick patients awaiting his turn." And given the facts presented, particularly that

---

[11] OCGA § 34-9-200 (c). In his brief, Dallas quotes from the prior version of this statute, which was amended to reflect the current language effective July 2003. See Ga. L. 2003, p. 364, § 2. The record shows that the appellate division applied the 2003 version of the statute. And Dallas has presented no cogent argument or supporting authority showing that the appellate division erred in using this version. To the extent Dallas contends the appellate division should have applied the pre-2003 language, therefore, his claim is deemed abandoned. See Court of Appeals Rule 25 (c) (2). Moreover, in *Chatham County Dept. of Family &c. Svcs. v. Williams*, 221 Ga. App. 366, 367 (1) (471 SE2d 316) (1996), we noted that during the course of an ongoing workers' compensation case that may continue for decades, the Board and the legislature will promulgate rules and pass statutes that "define and redefine the scope of the employer's obligations and the worker's rights with respect to medical care[,] and it would not make sense to freeze those obligations and rights as they were at the time of the injury[,] when the need for medical care continues." We thus held that "workers' compensation statutes and rules which do not render compensable an injury which would not otherwise be compensable, but which merely affect the scope of treatment required, will be applied to ongoing cases where the injury preceded the effective date of the law." Id. This language suggests that, even though Dallas' injury occurred in 2000, the 2003 statute defining his obligations with respect to continuing treatment applies in this case.

Dallas knew he could be seen by a doctor at GIC simply by walking into the clinic, at least some evidence supported the appellate division's determination that he failed to cooperate with treatment.[12]

The workers' compensation provisions required Dallas to submit himself for examination by his authorized treating physician.[13] Between August 2003 and the hearing before the ALJ in April 2004, Dallas failed to return to GIC for treatment, despite being ordered to do so.[14] Under these circumstances, the appellate division did not err in vacating the ALJ's award and suspending his benefits.[15]

3. Finally, Dallas claims that the appellate division erred in failing to assess attorney fees against Flying J. He argues that Flying J improperly sought suspension of his benefits and unreasonably defended against the requested increase in his average weekly wage.

Dallas does not specify the statutory provision through which he requests attorney fees. We presume he seeks this award under OCGA § 34-9-108 (b) (1), which provides that "[u]pon a determination that proceedings have been brought, prosecuted, or defended in whole or in part without reasonable grounds, the administrative law judge or the board may assess the adverse attorney's fee against the offending party." This provision, however, does not authorize an "award [of] attorney fees where the matter is closely contested on reasonable grounds."[16]

As found in Division 2, the appellate division did not err in suspending Dallas' benefits for failure to cooperate with medical treatment. Clearly, therefore, Flying J cannot be penalized for seeking such suspension.

We also find no error in the appellate division's refusal to assess attorney fees with respect to the average weekly wage issue. Based on Dallas' testimony regarding the overtime he worked before his injury, the ALJ and the appellate division found that his average weekly wage should be increased to $550. Dallas' testimony on this issue, however, was not particularly detailed, and he provided no clear evidence as to the number of overtime hours he worked each week. We recognize that Flying J paid Dallas $35,000 to settle a Fair Labor Standards Act claim regarding overtime. But it is unclear when

---

[12] See *Ga. Pacific*, supra (findings of appellate division will be affirmed if any evidence supports them).

[13] See OCGA § 34-9-200 (c).

[14] On appeal, Dallas asserts that the ALJ ordered Flying J to notify GIC that it should schedule an appointment for Dallas when he called. Dallas has not provided a record cite for this assertion, and the ALJ's August 12, 2003 order contains no such directive. Rather, it instructed Flying J to contact GIC and authorize treatment, which Flying J did.

[15] See id.; *Bankhead*, supra (appellate division may substitute its judgment for that of the ALJ where the ALJ's decision is not supported by a preponderance of the evidence).

[16] *Printpack, Inc. v. Crocker*, 260 Ga. App. 67, 72-73 (3) (b) (579 SE2d 225) (2003).

Dallas worked the overtime involved in the settlement. And Dallas admitted that Flying J's time records did not reflect all of the overtime he claims to have worked. Thus, although the evidence supported the wage increase, the appellate division did not abuse its discretion in finding that Flying J reasonably defended this issue.[17]

*Judgment affirmed. Smith, P. J., and Phipps, J., concur.*

DECIDED MAY 12, 2006 —
RECONSIDERATION DENIED JUNE 15, 2006 — ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Walter D. Adams*, for appellant.
*Neil C. Thom*, for appellee.

---

[17] See OCGA § 34-9-108 (b) (1); *Seabolt v. Beaulieu of America*, 255 Ga. App. 750, 753 (566 SE2d 444) (2002) (appellate division exercises its discretion in ruling on a request for attorney fees under OCGA § 34-9-108 (b)); *Grier v. Proctor*, 195 Ga. App. 116, 117-118 (2) (393 SE2d 18) (1990) (physical precedent only).